# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Bryan R. Mudrich,                    Civ. No. 11-1229 (JRT/JJK)

        Plaintiff,

v.

Wal-Mart Stores, Inc.,               **REPORT AND
                                     RECOMMENDATION**

        Defendant.

Bryan R. Mudrich, 15001 Greenhaven Drive, #231, Burnsville, MN 55306, *pro se*.

Stephanie D. Sarantopoulos, Esq., and Joseph D. Weiner, Esq., Littler Mendelson, PC, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

In Plaintiff's Amended Complaint (Doc. No. 52), he alleges that Defendant wrongfully terminated his employment based on gender discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, ("Title VII"), and the Minnesota Human Rights Act, Minn. Stat. § 363A.08 ("MHRA"). Plaintiff also alleges that Defendant violated the Whistleblower Act, Minn. Stat. § 181.932, and that Defendant defamed him during events leading up to his termination from employment. This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 90). The motion has been referred to this Court for a Report and Recommendation under 28 U.S.C. § 636

and D. Minn. LR 72.1.  For the reasons stated below, this Court recommends that Defendant's motion be granted in part and denied in part.

## BACKGROUND

Defendant Wal-Mart Stores, Inc. ("Wal-Mart"), terminated Plaintiff Bryan Mudrich from his job working in the Tire and Lube Express department ("TLE") at Store #3513 located in Shakopee, Minnesota, in the spring of 2010.  Plaintiff had been working there for approximately one year, starting in May 2009.  (Doc. No. 105, Affidavit of Byran R. Mudrich ("Mudrich Aff.") ¶ 2; Am. Compl. ¶ 2.)  His job title was "Service Writer," and his responsibilities included writing and servicing orders for oil changes, new tires, tire rotations, and other automobile services.  (Mudrich Aff. ¶ 3; Doc. No. 92, Aff. of Joseph D. Weiner in Supp. of Def.'s Mot. for Summ. J. ("Weiner Aff.") ¶ 2, Ex. A ("Mudrich Dep.") at 75, 102–03, 108–09.)  Plaintiff alleges that he was wrongfully terminated based on events that occurred on April 3, 2010.  He asserts that he was wrongly accused of providing free tire-rotation services to a customer on that day; he asserts that a co-worker, Catherine Kinnonen, gave the customer the free service.  Wal-Mart disciplined Plaintiff by requiring him to take a day off work on April 10, 2010.  He returned to work on April 11, 2010, and at that point believed that the problem was over, and he continued with his job as a service writer.  He received a generally favorable performance review a few weeks later, but then on April 30, 2010, he was told that his employment was terminated.

Plaintiff contends that he was the victim of sex discrimination because the woman who actually violated Wal-Mart's policies by giving out the unauthorized free services on April 3, 2010, Ms. Kinnonen, was not terminated, and indeed was not disciplined at all. (*See* Doc. No. 52, Am. Compl. at 2.) Wal-Mart asserts that Plaintiff was terminated because he did not comply with a company policy that required him to write a corrective-action plan after he was disciplined on April 9 for providing free customer services. It claims that (1) it disciplined Plaintiff because he gave unauthorized customer discounts on March 20, 2010, not April 3, 2010; (2) there was no discrimination in favor of Kinnonen; and (3) Kinnonen is not similarly situated to Plaintiff under the law.

To fully comprehend the underlying factual dispute, it is necessary to understand Wal-Mart's system for processing a customer's order for tire-rotation service. To process an order in the TLE department at Wal-Mart, an employee is supposed to follow the following procedure: (1) greet the customer; (2) log into a handheld scanning device using a personal login and password; (3) use the scanning device to scan the Vehicle Identification Number on the vehicle (this process puts the vehicle into the TLE system and creates a work order that is sent to the garage area); (4) await the garage technicians' completion of the service and the entry into the work order of the services performed on the vehicle; and (5) once the completed work order is sent to the cashier area within the TLE department, which specifies the work performed and calculates the costs of services, sign onto the register in the TLE area to ring up the customer. (Doc.

3

No. 77, Aff. of Regina Gilmore ("Gilmore Aff.") ¶ 9.)  If Wal-Mart provides any discounts, they can only be processed at the time of checkout.  (*Id.*)  Also, the handheld scanners are programmed to log the employee who last used the scanner out of the system if the scanner remains idle for more than two minutes. (Doc. No. 110, Dep. of Bryan Mudrich ("Pl. Dep.") at 167–68.)

Wal-Mart has a Coaching for Improvement Policy that is intended to encourage and assist Associates with improving their job performance and behavior to meet Wal-Mart's expectations.  (Gilmore Aff. ¶ 4, Ex. 1.)  The Coaching for Improvement Policy identifies several types of discipline that may be administered depending on the nature and severity of any misconduct, including a verbal coaching, a written coaching, and the issuance of a Decision-Making Day ("D-day") Coaching.  (*Id.*)  At the time of Plaintiff's employment, a Decision-Making Day Coaching resulted in a one-day, paid suspension and required the employee to develop an action plan for improved performance.  (*Id.*) The Policy further states that an employee who fails to submit an acceptable action plan following a Decision-Making Day Coaching is subject to immediate termination.  (*Id.*)

Prior to the events leading up to his termination, Plaintiff received disciplinary reprimands for violations of Wal-Mart policies.  On February 6, 2010, he received a verbal coaching after his managers discovered that he violated the TLE policy against combining two discounts when he allowed a customer to use multiple discounts at the same time without obtaining prior manager approval.

(Gilmore Aff. ¶ 5, Ex. 2.)  And on February 28, 2010, Plaintiff received a written coaching from Regina Gilmore, an assistant manager, and Marcellous "Buck" Wiley, Plaintiff's support manager, for attendance and punctuality concerns regarding incidents on several occasions throughout the previous two months. (*Id.* ¶ 6, Ex. 3; Pl. Dep. at 143.)  Plaintiff does not dispute that he met with Gilmore and Wiley to discuss these issues, but he does claim that he was never notified that either of these meetings were considered coachings under Wal-Mart's Coaching for Improvement Policy.  (Pl. Dep. at 139–45.)

It is undisputed that in late March 2010, Gilmore received a report for that month that indicated services had possibly been provided by the TLE department without a corresponding charge.  (Gilmore Aff. ¶ 7.)  One instance involved Plaintiff charging a type of bulk oil to a customer that was out of stock, which was later zeroed out.  And two other incidents involved Plaintiff zeroing out tire-rotation services charges on March 20, 2010, one of which involved a Buick Regal.  Plaintiff acknowledges these incidents and testified that he met with management about them, but he says they sent him on his way with no discipline.

Plaintiff alleges that on April 3, 2010, after Catherine Kinnonen clocked out at 2:00 pm, she returned to the TLE department and picked up Plaintiff's handheld scanner (which was logged into Plaintiff's badge number because he had recently barcoded a customer's vehicle), and went outside to scan another vehicle in, specifically a blue Jeep Cherokee. (Pl. Dep. at 153–54.)  The

customer brought the Jeep Cherokee in for a tire rotation, but, says Plaintiff, the customer was not entitled to a free rotation service because the tires did not have a sufficient amount of road wear; they were purchased at Wal-Mart only a few weeks earlier.

Because Kinnonen was using Plaintiff's handheld scanner, Plaintiff was locked out from using another device; therefore, Wiley told Plaintiff to go ahead and take his lunch break. (*Id.* at 162–64.) During Plaintiff's lunch break, Plaintiff alleges that Kinnonen scanned in another car, a Chevy Malibu, for a free tire-rotation packet, while still logged into the scanner under Plaintiff's badge number. Plaintiff asserts that the Malibu did not have Wal-Mart tires on it, and therefore the customer should have been charged a $30 fee for a tire-rotation service. (*Id.* at 164.) Plaintiff says that when he was returning from lunch, he saw Kinnonen working on the Malibu. (*Id.*) He also testified that when he returned from lunch, one of the other workers told him that he better watch it because Kinnonen had told him that she was out to get Plaintiff. (*Id.* at 228.) Plaintiff acknowledges that when he returned from lunch, he rang the Jeep Cherokee ticket out as zero (i.e., no charge). He did this because he presumed that no tire rotation was done on the Cherokee because the customer was not entitled to a free tire rotation. (*Id.* at 176–77.) However, he says that he did not ring out the Malibu ticket; the Malibu ticket also showed a zero charge to the customer. (*Id.* at 208.)

Plaintiff alleges that the next day, April 4, 2010, Kinnonen came to the TLE department and took Plaintiff to Gilmore's office. (*Id.* at 165.) There, Gilmore

asked Plaintiff whether he was giving away rotation packets, and Plaintiff told her he was not.[1] (*Id.*) According to Plaintiff, Gilmore showed him the two tickets from April 3, 2010, which related to the Jeep Cherokee and the Chevy Malibu, and asked him why his name and his cash register number were on the tickets. (*Id.*; *see also id.* at 248.) Plaintiff handed the tickets to Kinnonen and said, "Aren't those the ones that you wrote in with my handheld at lunchtime yesterday?" (*Id.* at 166.) Kinnonen responded, while holding the tickets up to her mouth in a suspicious manner, that she could not have written those tickets in because she clocked out at 2:00, and the time shown on the ticket for the Jeep Cherokee was 2:47 and was 3:01 for the Chevy Malibu. (*Id.*) Kinnonen then handed the tickets to Gilmore, and Gilmore told Plaintiff that she would consult Bryan Creel, the security-office manager, to review the cameras and go from there. (*Id.* at 166–68.) Gilmore then sent Plaintiff back to work.[2] (*Id.* at 167.)

According to Plaintiff, on April 9, 2010, Gilmore called Wiley and Plaintiff into her office. (*Id.* at 171.) Once there, Plaintiff asserts that Gilmore said that

---

[1]    Plaintiff testified that there were two or three other people in the office during this discussion. (*Id.* at 247–48.) Plaintiff claims that word then spread throughout Wal-Mart that he might be fired. (*Id.* at 249–51.)

[2]    Defendant states that for the purposes of its motion, it accepts as true that there was a conversation between Gilmore and Plaintiff on April 4, although Wal-Mart does not accept Plaintiff's version of what transpired in the conversation. (*See* Doc. No. 91, Mem. of Law in Supp. of Summ. J. ("Def.'s Mem.") 7 n.3.) It appears that Wal-Mart's reference to April 3 instead of April 4 as the date of the conversation was a typographical error.

she was going to give Plaintiff a "D-day" and showed them pictures stapled to the April 3rd tickets for the Jeep Cherokee and the Chevy Malibu. (*Id.*) The picture stapled to the Jeep Cherokee ticket was a picture of the Jeep Cherokee with a person checking the vehicle in; the person and the tags on the vehicle were blurred out. (*Id.* at 172.) Plaintiff asserts that Wiley tried to explain the Jeep Cherokee ticket to Gilmore, but before Wiley could finish, Gilmore turned the ticket over and turned their attention to the Malibu ticket. (*Id.* at 172–73.) Once Wiley saw the photo stapled to the Malibu ticket, he told Gilmore that it was the wrong car. (*Id.* at 180.) Gilmore said, "no, it's not." (*Id.*) Plaintiff then agreed with Wiley, explaining that the car in the picture is white, and on the ticket it is silver. (*Id.*) Gilmore then said, "no, it's not" again, and then turned the ticket over so it could not be seen. (*Id.*) Plaintiff asserts that Gilmore then told him to finish the day, take April 10th off, and return on April 11th to finish his D-day with the assistant manager Ahmed Jama, and to bring three letters – an admission letter (admitting that he gave away Wal-Mart packets), an apology, and an action plan.[3] (*Id.* at 180–81.)

---

[3] Gilmore's account of the April 9, 2010 meeting with Plaintiff, submitted by Wal-Mart in affidavit form, is quite different from Plaintiff's, and is provided without nearly as much detail. She mentions nothing about the Jeep Cherokee or Chevy Malibu tickets. Instead, she states only that "[o]n April 9, 2010, I met with Mudrich to again discuss the unauthorized discounts. I explained that we confirmed *via* video that he had provided an unauthorized discount." (Gilmore Aff. ¶ 11.) She does not explain what discounts on what cars or when the discounts were given. She does make a reference in her affidavit to a video recording of an employee checking in a Buick Regal in March, and this may be

(Footnote Continued on Next Page)

It is undisputed that when Plaintiff returned on April 11, 2010, he did not turn in a D-day action plan. However, Plaintiff asserts that when he returned on that day, he and Wiley spoke with Jama about finishing Plaintiff's D-day action plan. (Pl. Dep. at 182.) According to Plaintiff, Jama looked at Wiley and stated, "You can't give that man no D-day. Gina [Gilmore] has lost her mind." (*Id.*) Plaintiff and Wiley then returned to work. (*Id.*) Plaintiff asserts that he next told Wiley that they should clear all of this through his shift manager, Matt Caulkins, and Wiley agreed. (*Id.* at 184.) When Wiley returned from speaking with Caulkins, he told Plaintiff that Caulkins said he did not want anything to do with it. (*Id.*) At that point, Plaintiff thought that the whole ordeal was over. (*Id.*)

Plaintiff was not terminated on or shortly after April 11, 2010, for failure to submit an action plan. In fact, it is undisputed that Plaintiff continued to work from April 11, 2010, until April 30, 2010, without any discussion of possible termination based on the April 10, 2010 D-day.[4] On April 24, 2010, Plaintiff was

(Footnote Continued from Previous Page)
the subject of the unauthorized discount to which she is referring, but her affidavit is unclear. (*See id.* ¶ 10–11.)

[4]     The Court notes that Gilmore's affidavit is also very loose about when and what occurred after Plaintiff returned to work on April 11, 2010. She states: "Mudrich returned to work on April 11, 2010 but did not provide a written action plan as required. I told Mudrich that failure to complete an action plan would result in termination and gave him another opportunity to complete his action plan. He again refused to do so. As a result, Mudrich was terminated on May 2, 2010 for failing to complete the Decision Day coaching action plan." (Gilmore Aff. ¶ 12.) Her testimony implies that her conversation with Plaintiff about termination occurred on or shortly after April 11; however, Plaintiff disputes that

(Footnote Continued on Next Page)

provided with a performance evaluation, signed by Ahmed Jama, Catherine

Kinnonen, and Marsalis Wiley. (Doc. No. 110, Pl. Dep., Ex. 14.) In that

evaluation, he was given the rating "Development Needed" for all of the

categories provided. (*Id.*) Under "Strengths" the evaluation provided:

> Wears the right attire. He is dependable and is on time always. He
> has good customer service. Willing to do whatever ask [sic] of him.
> Very knowle[d]geable about the TLE service for the customers.

(*Id.*) Under "Areas of Opportunity" the evaluation provided:

> Needs to show proof of glasses are safety. Listen to his Supervisor.
> Let other Associates know you need help. Slow down when you
> write up the orders. Make sure when writing order you have the right
> information and right oil, tires and filter etc. [M]ake sure the
> customer [sic] have the lifetime tire rotations with them or research.
> [W]hen slow make sure you stay busy and find something [to] do.

(*Id.*) Nowhere in the evaluation is there mention of any disciplinary actions taken

against Plaintiff. (*Id.*) And Plaintiff testified that Wiley and Jama had told him

that if there were disciplinary actions, they would have been listed under

"Comments." (Pl. Dep. at 260–61.)

On April 30, 2010, Gilmore called Plaintiff to her office where she was

accompanied by her shift manager named John. (Pl. Dep. 185.) Plaintiff's

account of the conversation that then occurred is as follows:

> Gilmore:    "You remember the letters that I talked to you about about
>             your D-day and all of that?" (*Id.*)

---

(Footnote Continued from Previous Page)
was when the conversation occurred, asserting that he worked for approximately
twenty days without any discussion about termination. (*See* Pl. Dep. at 184–85.)

| | |
|---|---|
| Plaintiff: | "Yeah." (*Id.*) |
| Gilmore: | "Do you have them?" (*Id.*) |
| Plaintiff: | "No." (*Id.*) |
| Gilmore (pulling up a blank page on a PC): | "Okay, Bryan, go ahead and write your admission letter and your apology and your fix-it plan." (*Id.*) |
| Plaintiff: | "That's calling me a thief . . . . I'm not a thief, Gina. My mom and father didn't raise a thief." (*Id.*) |
| John: | "Look, Bryan, this is your opportunity. We're going to give you an opportunity to write these letters and then you'll be able to work with Wal-Mart under this D-day for the next year and everything will be fine." (*Id.* at 186.) |
| Plaintiff: | "Everything is not fine . . . . I didn't write those tickets." (*Id.*) |

Then, when Plaintiff tried to explain to John what had happened, Gilmore asked

Plaintiff for his badge. (*Id.*) Plaintiff explained the conversation continued as

follows:

| | |
|---|---|
| John: | "Well, what are we going to do now?" (*Id.*) Turning to Plaintiff, "[Do you] have [your] checks electro mailed into the bank right there at Wal-Mart?" (*Id.*) |
| Plaintiff: | "Yes." (*Id.*) |

(Gilmore then took Plaintiff's badge and discount card.)

| | |
|---|---|
| John: | "It's after 5:00. We can't send nothing to the corporate office until Monday. (*Id.*) |
| Gilmore: | "Oh, it don't matter. I'll just tell them that he quit." (*Id.*) |
| John: | "Bryan, I'm going to clock you out at 5:00 and then I'll call you because its going to take me some time to stop the transferring of your check to the bank and I'll call you." (*Id.* at 186–87.) |

Plaintiff:     "Okay."  (*Id.* at 187.)

Plaintiff was then dismissed from the office, and after a short conversation

with Wiley, Plaintiff left.  (*Id.*)  On May 2, 2010, two days after Plaintiff left,

Gilmore and Caulkins wrote the following on a Wal-Mart form:

> Bryan was observed on 3 24 work order #80933 writing up a bulk oil
> that we do not carry.  On 3 20 Bryan was observed on video writing
> up 2 separate service orders 80847, 80853 and giving them free
> rotates and balances when both customers never had tire warranty
> service.[5]  Bryan denied doing this.  Bryan's D-day was covered on
> 4 9, he was paid for dday on 4 10 and was to bring his dday letter in
> on 4 11.

(Pl. Dep, Ex. 5.)  The form also stated: "Associate failed to supply a decision

making letter to a member of management.  This forced the company to make

the decision to terminate Bryan's employment."  (*Id.*)  Wal-Mart officially

terminated Plaintiff on May 6, 2010.  (Doc. No. 101, Pl. List of Exhibits, Ex. A.)

On August 26, 2010, Plaintiff filed a Charge of Discrimination with the

Minnesota Department of Human Rights ("MDHR").  (*Id.* at Ex. B.)  In his Charge,

Plaintiff claimed he was discriminated against on the basis of his sex in violation

---

5       Plaintiff asserts that the two tire-rotation tickets that were brought to his
attention in his meeting with Gilmore were those relating to the April 3, 2010
incidents regarding the Jeep Cherokee and the Chevy Malibu.  He asserts that
the tickets referenced in this Coaching for Improvement form and that Defendant
now uses in this litigation to support inappropriate charges on March 20, 2010,
are different from the tickets that Gilmore showed him in the April 4, 2010
meeting; Plaintiff also provides a lengthy and detailed explanation in his
deposition as to why be believes the tickets appear to be altered.  (Pl. Dep. at
202–18.)

of Title VII.  (*Id.*)  On February 17, 2011, the MDHR dismissed Plaintiff's Charge and issued a Notice of Right to Sue.  (*Id.* at Ex. C.)

On May 11, 2011, Plaintiff, acting *pro se*, filed his Complaint with this Court.  (Doc. No. 1, Compl.)  On December 8, 2011, after the undersigned recommended Plaintiff's age discrimination claims be dismissed, Plaintiff filed an Amended Complaint.  (Doc. No. 52, Am. Compl.)  Thereafter, the District Court ordered Plaintiff's age discrimination claims dismissed, and affirmed that Plaintiff's sex discrimination claims and wrongful termination claim to the extent that it is based on sex discrimination, remain.  (Doc. No. 53, Order dated Dec. 9, 2011.)  On November 16, 2012, Defendant filed the Motion for Summary Judgment that is now pending before the Court, which was referred to the undersigned for a Report and Recommendation on January 7, 2013.  (Doc. Nos. 90, 98.)  On February 13, 2013, the undersigned held a hearing on the motion, at which Plaintiff was present *pro se* and Defendant was represented by counsel.[6]  (Doc. No. 108.)

## DISCUSSION

### I.    Standard of Review

Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

---

[6]     At that hearing, the undersigned asked counsel for Defendant to file Plaintiff's deposition in its entirety, which counsel for Defendant did.  (*See* Doc. No. 110.)

P. 56(a).  The Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009); *Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir. 2007). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  "There is no discrimination case exception to the application of summary judgment, which is a useful tool to determine whether any case, including one alleging discrimination, merits a trial."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc).[7]

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322; *Whisenhunt v. S.W. Bell Tel.*, 573 F.3d 565, 568 (8th Cir. 2009).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  In other words, a party opposing a

---

[7]     *Torgerson* held that there is no discrimination case exception to the application of summary judgment, abrogating the standard of review applied in *Wheeler v. Aventis Phams.*, 360 F.3d 853, 857 (8th Cir. 2004), and *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 851 (8th Cir. 2005), among others.

properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 256 (1986); *see Davenport v. Univ. of Ark. Bd. of Trustees*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247–49). This standard applies equally to a *pro se* plaintiff. *See Ramirez v. Harmon*, No. 03-5284 (JRT/AJB), 2006 WL 2583106, *2 (D. Minn. Sept. 1, 2006) (stating that "the *pro se* plaintiff still must present evidence to defeat a properly supported summary judgment motion and may not rely upon conclusory allegations and unsupported assertions") (citing *Dunavant v. Moore*, 907 F.2d 77, 80 (8th Cir. 1990)).

## II.  Analysis

### A.  Sex Discrimination/Wrongful Termination

Plaintiff asserts that he was discriminated against on the basis of sex in violation of Title VII and the MHRA. Title VII prohibits an employer from discharging an individual or discriminating against an individual with respect to his compensation on the basis of gender. 42 U.S.C. § 2000e-2(a)(1). The MHRA forbids employers from discharging an employee based on sex discrimination. Minn. Stat. § 363A.08, subd. 2(2). Discrimination claims under Title VII and MHRA are analyzed under the same framework. *Torgerson*, 643 F.3d at 1043. Because Plaintiff does not present direct evidence of discrimination, this Court analyzes the claims under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802

15

(1973). *See Canady v. Wal-Mart Stores, Inc.*, 440 F.3d 1031, 1034 (8th Cir. 2006). Under *McDonnell Douglas*, Plaintiff must first establish a prima facie case of gender discrimination. If Plaintiff can make out a prima facie case, Wal-Mart must come forward and identify a legitimate, non-discriminatory reason for the adverse employment action. *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 692–93 (8th Cir. 2009); *Tolen v. Ashcroft*, 377 F.3d 879, 883 (8th Cir. 2004); *Coffman v. Tracker Marine*, 141 F.3d 1241, 1245 (8th Cir. 1998). If Wal-Mart meets this burden of production, the presumption raised by the prima facie case disappears, and the burden shifts back to Plaintiff to show that the articulated reason was a pretext for discrimination. *Humphries*, 580 F.3d at 693; *Tolen*, 377 F.3d at 883; *Coffman*, 141 F.3d at 1245. "[T]he issue is whether the plaintiff has sufficient evidence that unlawful discrimination was a motivating factor in the defendant's adverse employment action." *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1127 (8th Cir. 2008) (internal quotations omitted).

### (i) Prima facie case of discrimination

To establish a prima facie case of discrimination based on gender, Plaintiff must establish that: (1) he is a member of a protected group; (2) he was meeting the legitimate expectations of his employer; (3) he suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently. *Carter v. Dayton Rogers Mfg. Co.*, 543 F. Supp. 2d 1026, 1033 (D. Minn. 2008); *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000).

Wal-Mart does not dispute that Plaintiff falls within a protected group and was terminated, thereby suffering an adverse employment action. But Wal-Mart does argue that Plaintiff cannot establish the remaining two elements to make a prima facie case of sex discrimination. This Court disagrees.

Wal-Mart argues that Plaintiff was not meeting its legitimate performance expectations citing the fact that Plaintiff was disciplined three times within a two-month time period. Wal-Mart says that Plaintiff was given a verbal coaching for providing unauthorized discounts and was given a written coaching for attendance issues in February 2010, and that Plaintiff rang up an inappropriate bulk oil charge, provided an unauthorized discount to a silver Buick Regal, and did not complete the requested action plan in March 2010. Plaintiff, however, contests the merits of these claims. He testifies that the attendance issue arose because he was actually working too much and not clocking out on his scheduled time, that the bulk oil issue came about because Wal-Mart was out of stock of the bulk oil and that he corrected the charge through management, and that the Buick Regal unauthorized discount problem resulted from a glitch in the system and that he also corrected the charge through management. Further, the undisputed facts are that: (1) Wal-Mart did not terminate Plaintiff upon return from the April 10 D-day; (2) assistant manager Ahmed Jama essentially told Plaintiff upon his return that he should not have been given a D-day, therefore implying that he need not comply with the action plan request; (3) Plaintiff continued to work from April 11 to April 30 without any discussion from

management about possible termination; and (4) although his April 24, 2010 performance evaluation stated what Plaintiff described as a boilerplate response "Development Needed," it also stated that Plaintiff was dependable, was always on time, had good customer service, was willing to do what was asked of him, and was very knowledgeable about TLE services, and did not mention any disciplinary actions taken against Plaintiff, again implying that he need not comply with the action plan request. These facts, when viewed, as they must be, most favorably to Plaintiff, support the conclusion that there is a genuine issue to be decided as to whether Plaintiff was meeting Wal-Mart's legitimate performance expectations.

Wal-Mart also argues that Plaintiff cannot establish that he was treated differently than other similarly situated female associates. The test to determine if one is "similarly situated" is different at each stage of the *McDonnell Douglas* analysis. *Wheeler v. Aventis Phams.*, 360 F.3d 853, 857 (8th Cir. 2004). The standard for determining whether employees are similarly situated at the prima facie stage is a "low threshold," requiring only that the employees "are involved in or accused of the same or similar conduct and are disciplined in different ways." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 851 (8th Cir. 2005) (quoting *Wheeler*, 360 F.3d at 857). Since the threshold at the prima facie stage is low, and since the nature of their employment and the narrow scope of both Plaintiff's and Kinnonen's duties allegedly performed on April 3, 2010, are sufficiently comparable (i.e., they were both involved in or accused of acts that resulted in

charges to customers being zeroed out), this Court concludes that Plaintiff can establish that he is similarly situated to female associates at the prima facie stage.

### (ii)    Legitimate, nondiscriminatory reason

In response to Plaintiff's prima facie case of discrimination, Wal-Mart proffers a legitimate, nondiscriminatory explanation for Plaintiff's termination – that Wal-Mart's Coaching for Improvement policy requires that an associate who received a D-day coaching complete an action plan to address his conduct, and Plaintiff did not do so.  This is a legitimate reason for an adverse employment action.  *See Johnson v. AT&T Corp.*, 422 F.3d 756, 762 (8th Cir. 2005) (stating that "[c]ontrary to [Plaintiff's] assertion, the proper inquiry *is not* whether [Defendant] was factually correct in determining that [Plaintiff] had made the bomb threats.  Rather, the proper inquiry is whether [Defendant] honestly believed that [Plaintiff] had made the bomb threats").

### (iii)    Pretext

While a district court may not second-guess an employer's valid, non-discriminatory employment decisions, the court still must analyze whether the proffered reasons are a pretext for intentional discrimination.  *See Moschetti v. Chicago, Cent. & Pac. R.R. Co.*, 119 F.3d 707, 710 (8th Cir. 1997).  A pretext inquiry "is limited to whether the employer gave an honest explanation of its behavior, not whether its action was wise, fair, or correct."  *McKay v. U.S. Dep't of Transp.*, 340 F.3d 695, 700 (8th Cir. 2003) (quotations omitted).  "A plaintiff

may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010). The standard for determining whether employees are similarly situated at the third stage (proving pretext) "is rigorous." *Wheeler*, 360 F.3d at 857 (quotations omitted); *see also Rodgers*, 417 F.3d at 853. Plaintiff attempts to show pretext with evidence of inconsistent disciplinary action and lack of investigation of another Wal-Mart employee, Kinnonen, for what he believes to be the conduct that resulted in his termination. The question here is whether this evidence creates a genuine issue of material fact in support of his claim that Wal-Mart's stated reason for his termination was pretextual and that Wal-Mart intentionally discriminated against him because of his gender in violation of Title VII and the MHRA. *See Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1021 (8th Cir. 2005) (stating that the plaintiff must point to "enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence [does] not directly contradict or disprove [the] defendant's articulated reasons for its actions." (quotations omitted)). "As a general proposition, it is true that a plaintiff who makes a *prima facie* case and who presents evidence which, if believed, would discredit the employer's asserted justification has a right to go to the trier of fact." *Lowe v. J.B. Hunt Transp.*, 963 F.2d 173, 174 (8th Cir. 1992).

Plaintiff's contends that Gilmore chose not to investigate further or discipline Kinnonen, who had allegedly used Plaintiff's scanner to provide unauthorized discounts (the same conduct that Wal-Mart alleges Plaintiff did), because Kinnonen is a female.  (*See* Pl. Dep. at 190 (explaining why Plaintiff believes Kinnonen was not disciplined).)  Instances of such disparate treatment can support a claim of pretext.  But Plaintiff must prove that he and Kinnonen were "similarly situated in all relevant respects."  *Riser v. Target Corp.*, 458 F.3d 817, 821 (8th Cir. 2006).  Courts "have equated the phrase 'similarly situated in all relevant respects' with the statement that '[e]mployees are similarly situated when they are involved in or accused of the same offense and are disciplined in different ways.'"  *Id.* (quoting *Rodgers*, 417 F.3d at 856).  "To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of 'comparable seriousness.'"  *Rodgers*, 417 F.3d at 853 (quoting *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972–73 (8th Cir. 1994)).  When viewing the evidence in the light most favorable to Plaintiff, this standard is met.   If one believes Plaintiff's story about the events that occurred on April 3, 2010, then both he and Kinnonen were accused of the same offense, yet Kinnonen was not disciplined and he was.  Plaintiff has therefore presented a genuine fact dispute on the issue of pretext.

Wal-Mart argues that no such genuine dispute exists because Plaintiff admits that he is unaware of any female associate not terminated despite failing to complete a D-day action plan.  Wal-Mart thus apparently contends that for a

female employee to be considered similarly situated to Plaintiff, the female employee must have been disciplined by being required to take a D-day, then failed to complete an action plan upon return to work, and then fired as a result. Wal-Mart misses the mark. The focus in this case should not be on finding someone who was disciplined precisely the same way as Plaintiff, but instead on finding someone similarly situated to Plaintiff who was *not* disciplined the same way as Plaintiff; that is, someone who was not disciplined by being required to take a D-day or complete an action plan or who was not disciplined at all. If Wal-Mart's argument were correct, an employer could sex discriminate by not disciplining similarly situated female employees for the same conduct that leads it to discipline male employees with impunity.

Wal-Mart also argues that Kinnonen cannot be considered similarly situated to Plaintiff because there is no evidence that Kinnonen had a similar disciplinary history as Plaintiff. However, as explained above, when viewing Plaintiff's explanations for his "disciplinary history" in the light most favorable to him, he either should not have been, or he actually was not, "disciplined" for the alleged prior infractions. Either way, this Court concludes that Plaintiff's and Kinnonen's comparative disciplinary history before the incidents in issue have no bearing on the analysis here. The issue is not whether one or the other of them had enough disciplinary history to justify termination, but rather, whether Kinnonen or Plaintiff should have been disciplined at all.

Wal-Mart further argues that Kinnonen cannot be considered similarly situated to Plaintiff because Kinnonen and Plaintiff had different job titles and responsibilities. However, "[t]he general rules as to the shifting burdens of production and persuasion in discrimination cases . . . are not to be applied woodenly, as if they were themselves statutory law. They are simply aids designed to make it easier to decide questions of fact about intent and motive." *Lowe*, 963 F.2d at 174. Generally, to show that other employees were similarly situated, Plaintiff is required to point to someone who had "dealt with the same supervisor, ha[d] been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004) (quotations omitted); *Marquez v. Bridgestone/ Firestone, Inc.*, 353 F.3d 1037, 1038 (8th Cir. 2004); *Clark*, 218 F.3d at 918.[8] A plaintiff need not show disparate treatment with an

---

[8] The task of discerning management status at Wal-Mart is complicated by the fact that Wal-Mart has so many "managers" and what appears to be an elaborate reporting structure. In the TLE department at the Shakopee store, for example, there were lower-level managers, who were actually paid on an hourly basis, including support managers, floor managers, and service managers. Plaintiff's support manager was Marcellous (Buck) Wiley, floor manager was a woman named Amy, and service manager (as of mid-March) was Catherine Kinnonen. Above the hourly managers in the manager hierarchy are the assistant managers. Here, Regina Gilmore was the assistant manager who typically oversaw the TLE department, among other departments. It appears that assistant manager Ahmed Jama also oversaw the TLE department on occasion, and it appears that Wiley typically reported to him. The assistant managers were overseen by shift managers – here, Gilmore reported to a shift manager named John, and Jama reported to a shift manager named Matt Caulkins. The shift

(Footnote Continued on Next Page)

23

identically situated employee, but only sufficient similarity to support the minimal

inference that the differences in treatment "may be attributable to discrimination*."*

*McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001); *see Robertson v.*

*Fed. Express Corp.*, No. 02-4161 (PAM/RLE), 2004 WL 1278929, at *3 (D. Minn.

June 5, 2004) (concluding factual disputes precluded summary judgment on

discrimination claims even when there were no white operations managers

similarly situated to plaintiff because arguably their disciplinary records differed

on account of the race discrimination and there was record evidence that other

employees were treated differently).  Further, "[t]he set of relevant factors is not

fixed; rather, courts must determine which factors are relevant to each case."

*Philip v. Ford Motor Co.*, 413 F.3d 766, 769 (8th Cir. 2005) (J. Heaney,

dissenting) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352

(6th Cir. 1998)).

The relevant factors in this case include whether there was a common

supervisor, whether the policy at issue applies to both employees, and whether

the misconduct the employees were accused of engaging in were similar.  Here,

it appears from Plaintiff's testimony that Kinnonen had recently been promoted to

service manager in March, and that during the time period relevant to this case,

she was still being trained.  (*See* Pl. Dep. at 115, 150.)  However, even though

(Footnote Continued from Previous Page)
managers were then supervised by the store manager, in this case a man named
Mark.

they had different titles and responsibilities at the time, both Plaintiff and

Kinnonen reported to Gilmore.  *Cf. Gilmore v. AT&T*, 319 F.3d 1042, 1046 (8th

Cir. 2003) (finding a comparator "was not similarly situated because his discipline

was not administered by the same supervisors who administered [plaintiff's]

discipline"); *see also Jackson v. City of St. Louis*, 220 F.3d 894, 896–97 (8th Cir.

2000) (analyzing whether employees are sufficiently similarly situated is easier

where the employees have the same supervisor).

Also, the record indicates that Wal-Mart had a rule prohibiting all TLE

employees from providing free rotation services, and part of Kinnonen's duties as

service manager was to make sure that the tickets were written correctly.  (*See*

Doc. No. 110, Pl. Dep., Ex. 4; Doc. No. 77, Gilmore Aff. ¶ 8; Pl. Dep. at 148.)

Specifically, the TLE policy states: (1) "DO NOT use unauthorized coupons,

discounting or combining services at reduced prices"; (2) "The TLE Service

Income Guide . . . specifies allowable services and charges for service rendered

. . . . If the TLE Service Guide is violated without conducting competitive

shopping, then disciplinary action will result up to and including termination"; and

(3) "It is the responsibility of all TLE Associates and Hardlines Assistant

Manager[s] to be familiar with and enforce the Service Income Guide."  (Doc.

No. 110, Pl. Dep., Ex. 4.)  Both Plaintiff and Kinnonen were accused of breaking

the same rule – providing services for free.  In other words, during the events that

occurred on April 3, 2010, Kinnonen was performing the exact same associate-

level duties as Plaintiff when she allegedly used Plaintiff's scanner to check in

vehicles. *See Fernandez v. Budget Exteriors, Inc.*, No. 10-4690 (JJK), 2012 WL 2871412, at *10 (D. Minn. July 12, 2012) ("For discriminatory discipline claims, employees are similarly situated when they 'are involved in or accused of the same offense and are disciplined in different ways.'" (quoting *Boner v. Bd. of Commis.*, 674 F.2d 693, 697 (8th Cir. 1982)); *cf. LaCroix v. Sears, Roebuck & Co.*, 240 F.3d 688, 694 (8th Cir. 2001) (pointing out that the plaintiff's purported comparator "worked in an entirely different department and had a different position," and therefore was not "similarly situated" to the plaintiff in all relevant respects). Further, while the record reflects that the duties of Kinnonen and Plaintiff with regard to ringing customers in were the same, if anything Kinnonen's duty to comply with company policy was higher than Plaintiff's, and therefore Plaintiff should be able to use Kinnonen as a comparator. *Cf. Freeman v. Ace Tel. Ass'n*, 404 F. Supp. 2d 1127, 1137 (D. Minn. 2005) (concluding that a staff worker could not be considered similarly situated to the plaintiff manager because as manager he had a duty not to deceive the Board, which was a higher duty than the staff worker had.) Although the test is rigorous for determining whether an employee is similarly situated, the test remains that the employees must be similarly situated in all *relevant* respects for proper comparison. *Harvey*, 38 F.3d at 972. Here, when viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that he and Kinnonen were similarly situated in all relevant respects. Therefore, this Court concludes that there is a genuine issue for trial.

26

Further, even if this Court were to conclude that Plaintiff has not identified a proper comparator to support his pretext argument, evidence of disparate treatment is not the only way in which a plaintiff may establish an inference of discrimination. Plaintiff may rely on any credible evidence tending to establish that Wal-Mart acted adversely to him "on account of" his gender. *See Allen v. Interior Constr. Servs., Ltd.*, 214 F.3d 978, 982 (8th Cir. 2000). Wal-Mart argues that there is no evidence that Plaintiff was treated differently because he is male. To the contrary, Plaintiff asserts that on two occasions Gilmore did not let either Plaintiff or Wiley explain what had happened, but she did listen to Kinnonen's version of what occurred. (Pl. Dep. at 188–89.) In addition, Plaintiff describes two other incidents where Gilmore allegedly displayed her distaste for other men – namely, on April 9, 2010, when she approached a man who stood against a wall and asked him whether he was scared and then grinned when he said yes (Pl. Dep. at 193–94), and when Plaintiff overheard another female employee and Gilmore laughing after the female employee asked Gilmore whether she was going to let a certain male employee transfer back into the TLE and Gilmore stated, "I'm going to transfer him right out of this house forever." (Pl. Dep. at 195.) With regard to the former, Plaintiff explained that the man ultimately was fired, and he does not know why. (*Id.* at 194.) Plaintiff also testified that he is not aware of any female associates that had been fired. (*Id.*) There is, thus, at least some evidence from which it could be inferred that Gilmore had animosity toward Plaintiff because he is male. And "the issue is whether the plaintiff has sufficient

27

evidence that unlawful discrimination was *a motivating factor* in the defendant's adverse employment action[,]" not *the motivating factor.* *Roberts*, 528 F.3d at 1127 (quotations omitted) (emphasis added). At a minimum, this Court concludes that Plaintiff should be able to present the evidence to a jury because a jury could infer from these statements that Gilmore's reason for terminating Plaintiff was more likely than not because he was male rather than because she was dissatisfied with Plaintiff's work performance.

In addition, determining whether there is enough evidence to raise genuine doubt as to the legitimacy of Gilmore's motive is an exercise riddled with genuine issues of material fact. Depending on whose story it believes, a jury could decide either way. Wal-Mart asserts that any events that might have occurred on April 3, 2010, were not the reason for Plaintiff's termination. Instead, Wal-Mart asserts that Gilmore gave Plaintiff a mandatory day off on April 10, 2010, solely because he provided unauthorized discounts on March 20, 2010, and that the sole reason Plaintiff was terminated was because he failed to complete an action plan as part of his D-day coaching, as policy required and as he was instructed to do. What Wal-Mart continues to ignore, however, is that Plaintiff contends that any disciplinary action that was responsive to the March 20, 2010 incidents was already taken care of well before April 3, 2010. Plaintiff contends that the April 10, 2010 D-day was given because of the incidents that occurred on April 3, 2010, and that he was wrongly accused of providing discounts on that day. Given these differing stories, a jury should decide whether the reason given by

Wal-Mart for the termination (i.e., the failure to complete an action plan), is pretextual. In other words, a jury should determine whether the real reason for Plaintiff's termination is that Gilmore wanted Plaintiff gone because he was male, and whether she wanted to cover up the inappropriate discounts given by Kinnonen—and protect Kinnonen from discipline—because she was female.

The Court notes that in a reverse discrimination case such as this, the Eighth Circuit requires the plaintiff to show that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Hammer v. Ashcroft*, 383 F.3d 722, 724 (8th Cir. 2004) (quotations omitted). A plaintiff can show suspicious background circumstances by providing evidence that the defendant is "inclined to discriminate invidiously against males or something 'fishy' about the facts that raises an inference of discrimination." *Woods v. Perry*, 375 F.3d 671, 674 (8th Cir. 2004), *abrogated on other grounds by Torgerson*, 643 F.3d at 1043. The suspicious background circumstances—viewed at this stage in the light most favorable to Plaintiff—casting serious doubt on whether Gilmore in good faith believed that Plaintiff provided inappropriate discounts, include the following: (1) Kinnonen providing free tire-rotation services on April 3, 2010; (2) the alteration of tickets[9]; (3) Wal-Mart's destruction of the April 3, 2010 video; (4) the suspicious way in which Gilmore and Kinnonen acted during the April 4, 2010

---

[9]     *See supra* note 5.

and April 9, 2010 meetings; (5) the fact that other managers apparently disagreed with Gilmore's decision to discipline Plaintiff; (6) the time-lag between Plaintiff's return from his D-day and his termination; and (7) the dubious way in which Gilmore treated Plaintiff during the termination meeting on April 30, 2010.

Finally, Wal-Mart argues that Plaintiff's sex discrimination claims must fail because it asserts that the record discounts Plaintiff's recollection of what occurred on April 3 and 4, 2010.  Wal-Mart contends that there is no evidence to support Plaintiff's claim that Kinnonen took his scanner and used it to check in a Jeep Cherokee and a Chevy Malibu on April 3, 2010; indeed, Wal-Mart says that there is no evidence that a Jeep Cherokee or Chevy Malibu was worked on at all on that day.  In addition, Wal-Mart contends that there is no evidence that there was any discussion between Gilmore and Plaintiff on April 4, 2010, about discounts on a Jeep Cherokee or a Chevy Malibu.  (Def.'s Mem. 7 n.3.)  In support of its argument, Wal-Mart first points to Gilmore's affidavit testimony.  However, her testimony is less than clear.  Gilmore says that after reviewing the March report, she spoke to Plaintiff about the TLE policy on providing free rotation services, and that Plaintiff claimed he did not provide any free rotation services.  (Gilmore Aff. ¶ 8.)  Gilmore does not state whether this meeting took place on April 4, 2010, or whether it took place sometime before then.  Instead, Gilmore's affidavit implies that the conversation she is referring to with Plaintiff was regarding the March 20, 2010 incidents, and that she was going to have video reviewed with respect to those incidents.  (*Id.* ¶ 10.)  Conspicuously absent

from Gilmore's affidavit is any testimony denying the alleged meeting on April 4, 2010, in which the Jeep Cherokee and Chevy Malibu were discussed.

Second, Wal-Mart contends that there is no record of any transactions on April 3, 2010, with respect to a Jeep Cherokee or Chevy Malibu. Wal-Mart cites to the Affidavit of Lindsey Moe, an Asset Protection Manager, who has access to the electronic journal for each cash register in the store at issue. (Doc. No. 89, Aff. of Lindsey Moe ("Moe Aff.") ¶ 4.) Moe explains that any transaction that occurs on a cash register in the store will be recorded in the electronic journal, and that the electronic journal contains the employee identification number of the individual who *checked out* the customer. (*Id.* ¶ 4–5.) Moe avers that "[n]o one using Mr. Mudrich's identification number provided any discounts to any customers on April 3, 2010." (*Id.* ¶ 7.) But this is not inconsistent with Plaintiff's account of what happened on April 3, 2010. Plaintiff asserts that even though he checked out the Jeep Cherokee as zero, it was not a *discount*, but instead was zeroed out because no services were performed. And as to the Malibu, Plaintiff testified that he did not check out the Malibu as zero, someone else did. Therefore, his identification number would not have been the one placed on the ticket at the time that the discount was provided.

Defendant also cites to the Affidavit of John Henthorn, a Programmer who conducts searches of databases related to various departments within Wal-Mart stores. Henthorn states that he searched for any service orders written for Chevy Malibus or Jeep Cherokees at any time and by anyone on April 3, 2010,

and that his search revealed no service orders. (Doc. No. 76, Aff. of John Henthorn ("Henthorn Aff.") ¶¶ 6–7.) Henthorn states that if any employee used a scanner on April 3, 2010, to scan in a Chevy Malibu or Jeep Cherokee, a record would be created automatically in the related Auto database. (*Id.* ¶ 7.) He states that "[n]o such record exists." (*Id.*) At most, Henthorn's testimony creates a fact dispute. The suggestion that no Jeep Cherokee or Malibu were serviced at all on April 3—in other words, that Plaintiff has made the whole thing up—is at odds with Plaintiff's very specific recollection about the events of April 3 and his very specific recollection of the discussion with Gilmore the next day on April 4, including his description of what Gilmore did with the Cherokee and Malibu tickets when she was showing them to Plaintiff and Wiley. In addition, Bryan Creel (the Asset Protection Coordinator), explains that any recordings on the DVRs for April 3, 2010, were deleted pursuant to company policy. (Doc. No. 75, Aff. of Bryan Creel ("Creel Aff.") ¶ 15.) Therefore, there is no way for the Court to now confirm via video footage that Kinnonen did not enter the tickets on April 3rd as Plaintiff contends. And all this Court has from Gilmore is her very general statement about meeting with Plaintiff, with no reference at all to whether there was any discussion about a Cherokee or Malibu. The absence of such evidence is glaring given the fact that Wal-Mart contends that the linchpin of its summary-judgment motion is that there allegedly was no Cherokee or Malibu work done on April 3, 2010. Further, what Henthorn does not testify to is whether a record could have been created and could have been later deleted. Therefore, while it

32

may be true that no such record "exists" now, it may also be true that such a record "existed" at some point previously. The latter would be consistent with Plaintiff's testimony that Gilmore had tickets relating to the Jeep Cherokee and the Chevy Malibu on April 4, 2010, and his belief that certain records in this case have been altered.

And third, Wal-Mart asserts that "it is impossible for Kinnonen to use Mudrich's scanner with his log-in information 30 minutes between incidents." (Def.'s Mem. 7.) At the February 13, 2013 hearing before the undersigned, Plaintiff explained that it was not impossible for Kinnonen to use his scanner with his log-in information between the incidents because if she tapped the screen on the scanner at any time before the two-minute time limit was up, then the scanner would remain live under his log-in information. In sum, contrary to Defendant's assertion, the evidence that they have presented to the Court is not conclusive evidence that Kinnonen did not use Plaintiff's scanner to start the tickets for the Jeep Cherokee and Chevy Malibu on April 3, 2010, nor does it conclusively show that there was no meeting on April 4, 2010, about those very tickets.

Viewed cumulatively, and in the light most favorable to Plaintiff, the facts in the record are sufficient to generate a triable question regarding pretext and discriminatory animus. *See Willnerd v. First Nat'l Neb., Inc.*, 558 F.3d 770, 779 (8th Cir. 2009); *Ordahl v. Forward Tech. Indus., Inc.*, 301 F. Supp. 2d 1022, 1025 (D. Minn. 2004) ("[D]isputes over facts that might affect the outcome of the suit

under the governing substantive law will preclude the entry of summary judgment.").  In other words, the evidence in the record creates a genuine issue as to whether Wal-Mart terminated Plaintiff because he failed to produce an action plan, or whether Wal-Mart terminated Plaintiff because of his gender. When a plaintiff meets his burden to produce evidence supporting a possible inference that the employer's proffered reasons are pretext for unlawful discrimination, the court may not grant summary judgment, even when it appears unlikely that the plaintiff will meet his ultimate burden to show that his termination was the result of discriminatory animus.  *See Hossaini v. W. Mo. Med. Ctr.*, 97 F.3d 1085, 1088 (8th Cir. 1996) (citing *Anderson*, 477 U.S. at 255).  Therefore, this Court concludes that summary judgment is not warranted on Plaintiff's gender discrimination claims.[10]

### B.    Whistleblower claim

The Minnesota Whistleblower Act prohibits an employer from firing an employee because the employee, acting in good faith, reported a suspected violation of a federal or state law.  Minn. Stat. § 181.932, subd. 1.  Plaintiff relies on his recollection of what occurred on April 4, 9, and 30, 2010, to support his

---

[10]    Wal-Mart also argues that summary judgment should be granted on Plaintiff's claims of Title VII and MHRA retaliation and reprisal.  After reviewing Plaintiff's Amended Complaint, this Court does not construe Plaintiff to be alleging such claims.  Because retaliation and reprisal claims are not a part of this action, there is no need for the Court to consider their dismissal.  Therefore, this Court does not address Wal-Mart's arguments here.

Whistleblower claim, which is the same set of facts that he relies on to support his Title VII and MHRA discrimination claims.

The MHRA exclusivity provision states "as to acts declared unfair by sections 363A.08 to 363A.19, and 363A.28, subdivision 10, the procedure herein provided shall, while pending, be exclusive." Minn. Stat. § 363A.04. Thus, "an employee may not seek redress for the same allegedly discriminatory practices on the same facts under both the MHRA and the Whistleblower Act[.]" *Abraham v. Cnty. of Hennepin*, 639 N.W.2d 342, 347 (Minn. 2002). "[T]he exclusivity provision of the [MHRA] operates as a bar to the separate maintenance of [the employment discrimination] claim under the Whistleblower Act." *Williams v. St. Paul Ramsey Med. Ctr., Inc.*, 551 N.W.2d 483, 486 (Minn. 1996); *see also Wesman v. United Postal Serv., Inc.*, No. 08-457 (DSD/SRN), 2008 WL 2564458, at *4 (D. Minn. June 24, 2008) ("[Plaintiff] seeks relief under the Whistleblower Act pursuant to the same facts and alleged discriminatory practices as his MHRA claims. Therefore, the MHRA provides his exclusive remedy, and his Whistleblower Act claim is dismissed."); *McKenzie v. Rider Bennett, LLP*, No. 05-1265 (JNE/SRN), 2006 WL 839498, at *5 (D. Minn. Mar. 28, 2006) (dismissing a plaintiff's whistleblower claim under the MHRA's exclusivity provision because it was essentially identical to the MHRA claim).

Here, because Plaintiff seeks relief under the Whistleblower Act pursuant to the same facts and alleged discriminatory practices as his MHRA claims, the

MHRA's exclusive remedy provision bars Plaintiff's whistleblower claim, and this Court recommends that Plaintiff's whistleblower claim be dismissed.[11]

## C.  Defamation claim

For a statement to be considered defamatory, "it must be communicated to someone other than the plaintiff, it must be false, and it must tend to harm the plaintiff's reputation and to lower him in the estimation of the community." *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980).  Plaintiff alleges that Wal-Mart defamed him when Gilmore asked him on April 4, 2010, in the presence of other people, whether he was giving away rotation packages, and when, after Plaintiff stated no, Gilmore asked why it was that his name and cash register number were on the tickets.  Plaintiff contends that through her questions, Gilmore was implying that he was a thief.  Wal-Mart asserts that

---

[11]    In Plaintiff's deposition, he identified three reports that serve as the basis for his whistleblower claim: (1) that he told Gilmore that Wal-Mart released a Chevy Malibu out of the shop illegally on April 3, 2010; (2) that he told Gilmore that it was illegal for Gilmore to take video and still shots of the cars out of the security office; and (3) that he told Gilmore that it was illegal for Kinnonen to use his handheld scanner to ring in the cars.  (Pl. Dep. at 235–36.)  This Court notes that even if the MHRA's exclusive remedy provision did not bar Plaintiff's whistleblower claim, the claim would likely still fail because this Court is unaware of a federal or state rule or law implicated by these reports.  The lack of an actual law renders these alleged reports unprotected for purposes of the whistleblower statute. *Kratzer v. Welsh Cos., LLC*, 771 N.W.2d 14, 22–23 (Minn. 2009); *see also Obst v. Microtron, Inc.*, 614 N.W.2d 196, 204 (Minn. 2000) (concluding that a report that raised safety concerns about a windshield-wiper device did not allege illegal conduct necessary to support a whistleblower claim); *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 504 (Minn. 1991) (concluding that a report about behavior that "seems distasteful and . . . ill-advised, but that is not . . . illegal" is not protected conduct under the Act).

Gilmore's statements are true, and even if they were false, they are protected by a qualified privilege.

"In determining whether a particular statement is defamatory, a court must review the statement in the context in which it was presented, give the words their obvious and natural meaning, and consider the innuendos which follow from the statement." *Michaelis v. CBS, Inc.*, 119 F.3d 697, 700 (8th Cir. 1997). "If words are reasonably capable of carrying a defamatory meaning, the determination as to whether the communication was in fact defamatory is for the jury." *Id.* Further, defamation by implication is a viable cause of action in Minnesota. *Id.* at 701. One form of defamation by implication is "the juxtaposition of facts so as to imply a defamatory connection between them," and another form is "the omission of facts." *Id.* "In an implied defamation case, a defendant does not avoid liability by simply establishing the truth of the individual statement. Instead, the defendant must also defend the juxtaposition of the two statements or the omission of certain facts." *Id.*

Taken in context, this Court concludes that one could find that the two questions asked by Gilmore, when asked one after the other, could imply defamatory meaning. In other words, the questions could have been interpreted by those that heard it as implying that Plaintiff was a thief, when actually he might not have been. However, because the truth or falsity of the implication is disputed, whether the statements were in fact defamatory is a question for the jury.

37

Assuming that the language that forms the basis for Plaintiff's defamation claim is defamatory, Wal-Mart argues that summary judgment should still be granted based on a qualified privilege. To be privileged, "a statement must be made upon a proper occasion, from a proper motive, and based upon reasonable or probable cause." *Hunt v. Univ. of Minnesota*, 465 N.W.2d 88, 92 (Minn. Ct. App. 1991); *see also Bol v. Cole*, 561 N.W.2d 143, 149 (Minn. 1997). "Qualified privilege rests, however, on more than having a proper occasion and purpose." *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 380 (Minn. 1990). "The employer must also have reasonable or probable grounds for believing in the validity of the statement, even though hindsight might show the statement to be false." *Id.* Whether or not a qualified privilege exists is a question of law. *Hunt*, 465 N.W.2d at 92. "Qualified privileges are recognized because statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory." *Id.* (internal quotations omitted). "[S]tatements made in the course of an employer's investigation into employee misconduct are protected by the qualified privilege." *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 923 (Minn. 2009). Here, Gilmore's questions were made in the context of a legitimate investigation, and thus were made in a proper context. And, even when taking Plaintiff's version of the facts as true, when Gilmore asked Plaintiff the questions at issue, she had in front of her tickets indicating that discounts were inappropriately provided, and Plaintiff's badge number was on the tickets. In addition, she was aware of a prior incident

involving Plaintiff ringing up improper discounts.  Therefore, probable cause

existed for Gilmore to ask Plaintiff the questions,[12] and her questions are subject

to a qualified privilege.

This, however, is not the end of the inquiry.  A plaintiff can overcome a

conditional privilege by proving common law malice.  *Hunt*, 465 N.W.2d at 92.

"Common law malice is actual ill will, or intent to causelessly and wantonly injure

the plaintiff."  *Id.* (internal quotations omitted).  Malice may be proved by

evidence that the defendant knew that the statements were false or by "extrinsic

evidence of personal ill feeling, or by intrinsic evidence such as the exaggerated

language of the libel, the character of the language used, the mode and extent of

publication, and other matters in excess of the privilege."  *Frankson v. Design

Space Int'l*, 394 N.W.2d 140, 144 (Minn. 1986) (quotations omitted).  Malice

cannot be implied from the mere fact that a statement was inaccurate.

Otherwise, the qualified privilege would protect only true statements, i.e.,

statements that are not defamatory in the first place.  *Bol*, 561 N.W.2d at 150.

Malice is generally an issue for the jury, but a court can grant summary judgment

---

[12]     This Court notes that it appears that Gilmore was also relying on the
account given her by Kinnonen, who arguably had an interest in shifting any
blame away from herself.  *See Wirig*, 461 N.W.2d at 380–81 ("We believe that an
employer who takes no steps to investigate but relies entirely on accusations
either made by employees who may be biased or on second-hand hearsay with
no identification of sources, has not acted as a reasonably prudent person and
lacks probable or reasonable grounds for making a potentially defamatory
statement.").  But this does not negate the undisputed fact that Plaintiff's badge
number was on the tickets.

on the issue of malice if there is insufficient evidence to raise a genuine question of fact. *Id.*

This Court concludes that there is evidence in the record that raises a genuine issue as to whether Gilmore acted out of malice when she asked Plaintiff the questions at issue on April 4, 2010. If Plaintiff's version of the facts is accepted as true, then Kinnonen presumably went to Gilmore sometime after the transactions occurred on April 3, 2010, and before the meeting with Plaintiff on April 4, 2010, to blame the transactions on Plaintiff, as Plaintiff testified that it was Kinnonen who brought him back to Gilmore's office on April 4, 2010. (Pl. Dep. at 165.) And there is evidence that Kinnonen may have brought the tickets to Gilmore's attention on April 4, 2010, out of ill will towards Plaintiff (based on her comments that she was out to get him). The inference that can be drawn is that Gilmore chose to protect Kinnonen, and to focus the investigation on Plaintiff because of some ill will that she had toward him. Further, Gilmore's actions after the April 4, 2010 meeting with Plaintiff are not only "fishy," as stated above, but raise serious questions as to her motives and would be consistent with a finding of malice. In addition, although Plaintiff testified that during the meetings that took place on April 4, and April 9, 2010, he did not feel that Gilmore was discriminating against him because of his sex and he did not feel any "mean spirit" from Gilmore (Pl. Dep. at 169, 183), what Plaintiff felt at the time is irrelevant to the question whether Gilmore was actually acting out of malice. Because of these disputed facts, this Court concludes that the question whether

Gilmore acted with malice when she asked Plaintiff the two questions on April 4, 2010, should be sent to the jury. Accordingly, this Court concludes that Wal-Mart is not entitled to summary judgment on Plaintiff's defamation claim.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.     Defendant's Motion for Summary Judgment (Doc. No. 90), be **GRANTED IN PART** and **DENIED IN PART** as follows: (a) the motion be **GRANTED** with respect to Plaintiff's whistleblower claim; and (b) the motion be **DENIED** with respect to Plaintiff's wrongful termination/sex discrimination claims and his defamation claim.


Date: March 22, 2013                         _s/ Jeffrey J. Keyes_____
                                             JEFFREY J. KEYES
                                             United States Magistrate Judge


Under Local Rule 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **April 5, 2013,** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **fourteen days** after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the

District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.