UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| BRYAN R. MUDRICH, | Civil No. 11-1229 (JRT/JJK) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ADOPTING THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE** |
| WAL-MART STORES, INC, | |
| Defendant. | |

Bryan R. Mudrich, 15001 Greenhaven Drive, Apartment 231, Burnsville, MN 55306, *pro se*.

Stephanie D. Sarantopoulos and Joseph D. Weiner, **LITTLER MENDELSON, PC**, 80 South Eighth Street, Suite 1300, Minneapolis, MN 55402, for defendant.

Plaintiff Bryan R. Mudrich worked in the Tire and Lube Express department of Defendant Wal-Mart Stores, Inc. ("Wal-Mart") for approximately one year before his termination in the spring of 2010. Mudrich alleges that he was wrongfully terminated because Wal-Mart engaged in gender discrimination in violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.08. Mudrich also brings a claim for defamation and alleges that Wal-Mart violated the Whistleblower Act, Minn. Stat. § 181.932. On March 22, 2013, United States Magistrate Judge Jeffrey J. Keyes issued a Report and Recommendation ("R&R") recommending that the Court grant Wal-Mart's motion for summary judgment with respect to Mudrich's whistleblower claim and deny the motion with respect to Mudrich's

wrongful termination/gender discrimination claims and his defamation claim. Wal-Mart made timely objections to the R&R. (Docket No. 111.) Mudrich did not object to the dismissal of his whistleblower claim. Having conducted a *de novo* review of those portions of the R&R to which Wal-Mart objects, *see* 28 U.S.C. § 636(b)(1)(C), D. Minn. L.R. 72.2(b), and having carefully reviewed the submitted materials, the Court overrules Wal-Mart's objections and adopts the R&R in its entirety.

## BACKGROUND[1]

Mudrich began working in Wal-Mart's Tire and Lube Express department in May 2009. (Aff. of Bryan R. Mudrich ¶ 2, Jan. 7, 2013, Docket No. 105.) Mudrich was a "Service Writer" and was responsible for writing orders and performing services such as oil changes, tire replacements, battery changes, and tire rotations. (*Id.* ¶ 3.) Mudrich contends that he was wrongly terminated because he was accused of providing a free tire rotation on April 3, 2010, that his co-worker, Catherine Kinnonen, had provided. (*See id.*)

Mudrich alleges that he was the victim of gender discrimination because Wal-Mart did not discipline Kinnonen at all, much less fire her. (Second Am. Compl. at 2, Dec. 9, 2011, Docket No. 52.) Wal-Mart contends that it terminated Mudrich because he did not comply with a company policy that required him to write a corrective action plan as part

---

[1] For a complete recitation of the facts, see the R&R at 2-13.

of his discipline for violations that occurred on March 20, 2010, not the April 3 incidents.[2]  (Aff. of Regina Gilmore ¶¶ 10-12, 15, Aug. 6, 2012, Docket No. 77.)

*Wal-Mart's Disciplinary Policy and Mudrich's Disciplinary History*

Wal-Mart has a "Coaching for Improvement Policy" that identifies types of discipline that may be administered depending on the nature and severity of the misconduct.  (Gilmore Aff. ¶ 4.)  The policy identifies verbal coaching, written coaching, and "Decision-Making Day Coaching" as possible types of discipline.  (*Id.*; *see also* Mudrich Aff. ¶ 20.)  Decision-Making Day Coaching or "D-Day" coaching results in a one-day paid suspension and requires the employee to submit an "action plan for improved performance."  (Gilmore Aff. ¶ 4; *see also* Mudrich Dep. 182:1-2, Docket No. 110.)

During his year of employment with Wal-Mart, Mudrich received reprimands for violations of Wal-Mart policies.  On February 7, 2010, he received a verbal coaching for inappropriately combining two customer discounts without manager approval.  (Gilmore Aff. ¶ 5.)  Mudrich does not dispute that he met with assistant manager Regina Gilmore about combining the discounts (Mudrich Dep. 136:22-137:20), but Mudrich did not recognize that the meeting was a verbal coaching (*id.* 139:17-24).  On February 28, 2010, Mudrich received a written coaching for attendance and punctuality concerns.  (Gilmore Aff. ¶ 6.)  Mudrich contends that although concerns about his attendance were addressed

---

[2] Wal-Mart contends that Mudrich did not charge two customers for tire rotations on March 20, and that it investigated these incidents and presented evidence to Mudrich of these violations, not the April 3 incidents.  *See* Gilmore Aff. ¶¶ 7, 10.

by his managers, he never received the documentation for the written coaching and he did not know either meeting was considered coaching under Wal-Mart's policies. (Mudrich Dep. 140:19-145:22.)

*The Disputed Discounts and D-Day Discipline*

In late March 2010, Gilmore received a report indicating that Mudrich may have provided services on March 20 without charging for them. (Gilmore Aff. ¶ 7.) To fully understand the factual dispute, it is necessary to understand Wal-Mart's system of processing orders in its Tire and Lube Express department. First, a service writer like Mudrich is supposed to greet the customer and log into a handheld scanning device using a personal login and password. (Gilmore Aff. ¶ 9.) The service writer uses the scanning device to scan the Vehicle Identification Number and write the service order, creating a work order that is sent to the garage area. (*Id.*; Mudrich Aff. ¶ 5.) After the garage technicians service the vehicle, they enter a work order via a computer. (Gilmore Aff. ¶ 9.) This completed work order is sent to the cashier area where the service writer signs onto the register and rings up the customer. (*Id.*) Any discounts provided to the customer must be processed at the time of checkout. (*Id.*) In addition, the handheld scanning device is programmed to log out an employee if it remains idle for more than two minutes. (Mudrich Dep. 167:18-168:2,)

Mudrich alleges that on April 3, 2010, after Kinnonen had clocked out for the day she returned to the Tire and Lube Express department and used a scanner Mudrich was logged in on to scan in at least one customer vehicle. (*Id.* 153:11-154:9.) Mudrich states

that because Kinnonen was using his scanner, he was unable to log into Wal-Mart's system and so he was sent to take his lunch break. (*Id.* 162:5-2.)

Mudrich contends that he met with Gilmore and Kinnonen on April 4, 2010, and Gilmore asked him why he was "giving away" services. (*See* Mudrich Dep. 165:1-166:20.) Mudrich denied giving away services. (*Id.* 165:5.) Gilmore then showed him two tickets from the previous day and told him the tickets indicated that he was the service writer. (*Id.* 165:5-11.) According to Mudrich, he then stated that Kinnonen had written up the tickets while he was at lunch. (*Id.* 166:9-11) Gilmore then stated she would meet with Wal-Mart's Asset Protection group. (*Id.* 166:21-167:3.) Mudrich testified that there were "a lot of people in the office," including some he did not know, during this meeting. (*Id.* 247:1-248:23.)

On April 9, 2010, Gilmore met with Mudrich and Mudrich's support manager, Buck Wiley. (Gilmore Aff. ¶ 11; Mudrich Dep. 171:3-7.) At this meeting, Gilmore told Mudrich they had "confirmed via video that he had provided an unauthorized discount." (Gilmore Aff. ¶ 11.) Mudrich alleges that Gilmore presented him with video stills and the "tickets" from April 3. (Mudrich Dep. 171:12-172:12.) Mudrich also contends that Gilmore did not allow him or Wiley to explain or discuss the tickets. (*Id.* 172:18-173:7.) Wal-Mart states that the evidence presented was for the March 20 violation, not the April 3 incidents. (*See* Def.'s Mem. in Opp. at 2-3, Docket No. 115.) During that meeting, Gilmore told Mudrich she was giving him a D-Day. (Mudrich Dep. 172:13-14.) Gilmore instructed Mudrich to bring in three letters when he returned and to meet with another assistant manager Ahmed Jama to "finish" his D-Day. (*Id.* 180:8-17, 181:17-21.)

Mudrich finished working and took paid leave the next day, April 10, for his D-Day. (*Id.* 181:22-182:2.) Mudrich did not write an action plan for improved performance. (*Id.* 182:3-4; Gilmore Aff. ¶ 12.)

On April 11, his first day back at work, Mudrich met with Wiley and Jama to finish his D-Day process. (Mudrich Dep. 182:4-183:1.) According to Mudrich, Jama did not ask for Mudrich's action plan but told Wiley, "You can't give that man no D-day. Gina [Gilmore] has lost her mind." (*Id.* 182:4-23.) Mudrich assumed that the matter was resolved. (*Id.* 184:20-23.)

On April 24, 2010, Mudrich received his performance evaluation, signed by Jama, Kinnonen, and Wiley. (*Id.* 258:12-259:15 & Ex. 14.) Mudrich received "Development Needed" for all of the categories provided (out of five possible options from "Role Model" to "Below Expectations"). (*Id.* Ex. 14.) Mudrich testified that Wiley had told him his first evaluation was boilerplate or "prewritten." (*See id.* 122:14-123:14.) Under Strengths, the evaluation stated:

> Wears the right attire. He is dependable and is on time always. He has good customer service. Willing to do what ever ask [sic] of him. Very knowledgeable about the TLE service for the customers.

(*Id.*, Ex. 14.) Under "Areas of Opportunity, the evaluation provided:

> Needs to show proof of glasses are safety. Listen to his Supervisor. Let other Associates know if you need help. Slow down when you write up the orders. Make sure when writing order you have the right information and right oil, tires and filter ect. [sic] [M]ake sure the customer have the lifetime tire rotations with them or research. [W]hen slow make sure you stay busy and find something to do.

(*Id.*)  The evaluation contains no reference to disciplinary action.  (*See id.*)  Mudrich testified that both Wiley and Jama told him any disciplinary actions would have been listed in the Comments section.  (Mudrich Dep. 260:5-261:2; *see also id.* 123:14-18.)

On April 30, 2010, Gilmore again met with Mudrich and another Wal-Mart employee.  (*See* Mudrich Dep. 185:2-9.)  Gilmore asked Mudrich if he had completed an action plan, "admission letter,' and "apology."  (*Id.* 185:12-21.)  Mudrich said that he had not and Gilmore gave him another opportunity to write the letters.  (*Id.* 185:19-186:7.)  Mudrich refused, saying that he would not admit responsibility for something that he had not done or for being a "thief."  (*Id.* 185:19-186:9.)  When Mudrich tried to explain what had happened, Gina asked for Mudrich's badge and discount card.  (*Id.* 186:9-18.)

*Procedural History*

On August 26, 2010, Mudrich filed a Charge of Discrimination with the Minnesota Department of Human Rights ("MDHR").  After the MDHR dismissed the action, Mudrich filed his Complaint in this Court.  (May 11, 2011, Docket No. 1.)  After several amendments and a motion to dismiss, on November 16, 2012, Wal-Mart filed its motion for summary judgment.  (Docket No. 90.)  After a hearing, the Magistrate Judge issued an R&R recommending that the Court grant Wal-Mart's motion for summary judgment with respect to Mudrich's whistleblower claim but deny the motion with respect to Mudrich's wrongful termination/gender discrimination claims and his defamation claim.  Wal-Mart objects that there is no evidence of gender discrimination

and that it is entitled to a defense of truth on the defamation claim. The Court will address each objection in turn.

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

### II. GENDER DISCRIMINATION CLAIMS

Mudrich's gender discrimination claims under both the MHRA and Title VII must be analyzed under the three-step framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).[3] *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011). Mudrich must first make out a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802-03. The burden then shifts to Wal-

---

[3] A plaintiff could also make a claim of discrimination by presenting direct evidence, *Torgerson*, 643 F.3d at 1044; however, Mudrich has not identified any direct evidence of discrimination.

Mart to articulate a legitimate – non-discriminatory – reason for its employment action. *Id.* If Wal-Mart presents a legitimate reason for the employment action, Mudrich can prove discrimination by showing that Wal-Mart's explanation is pretextual. *Id.* at 804.

### A. *Prima facie* case

To establish a *prima facie* case of discrimination, Mudrich must show "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011). Wal-Mart does not dispute that Mudrich is a member of a protected class and that he suffered an adverse employment action. Wal-Mart argues that Mudrich cannot establish he met his employer's legitimate expectations or that the circumstances give rise to an inference of discrimination.

#### 1. Wal-Mart's Legitimate Performance Expectations

Wal-Mart argues that Mudrich was not meeting its legitimate performance expectations, even prior to his failure to complete the D-Day forms. But, as the R&R outlines, it is undisputed that Wal-Mart did not terminate Mudrich upon his return from his D-Day and that Plaintiff continued to work for almost three weeks without any discussion of termination. (R&R at 17.) In addition, Jama told Mudrich that he should not have been given a D-Day. (*Id.*) Moreover, Mudrich received a mixed performance evaluation a week before his termination that did not mention any disciplinary actions against Mudrich or imply that he needed to comply with the action plan request. (*Id.* at

17-18.) These facts, viewed in the light most favorable to Mudrich create a genuine issue of fact regarding whether Mudrich was meeting Wal-Mart's legitimate performance expectations.

Wal-Mart argues that Mudrich's belief that his discipline was unwarranted is not relevant. It is true that a conclusory statement by an employee that he or she met the employer's expectations alone would not defeat summary judgment. *See Miller v. Citizens Sec. Grp., Inc.*, 116 F.3d 343, 346 (8th Cir. 1997). But in light of the circumstances Mudrich describes, particularly the mixed messages he received from supervisory figures, the Court finds that Mudrich's belief that his performance was satisfactory may have been reasonable and there is a genuine factual dispute regarding whether he was meeting Wal-Mart's expectations.

Wal-Mart also contends that Mudrich cannot rely on his performance evaluation as evidence because he was rated "Development Needed" in every category. Nevertheless, Mudrich was not rated the lowest category, "Below Expectations" (*see* Mudrich Dep., Ex. 14), and given his testimony that "Development Needed" was a boilerplate response, a factual issue exists regarding whether Mudrich was meeting expectations.

Finally, Wal-Mart states that because Jama was not the manager who disciplined Mudrich his statement that Mudrich should not have been given a D-Day is irrelevant. But Mudrich testified that Gilmore told him to "finish" his D-Day process with Jama and that Jama held an equivalent supervisory position to Gilmore. Therefore, a factual dispute exists regarding Jama's authority to override Gilmore's disciplinary decisions. In

sum, the Court finds that viewing the facts in the light most favorable to Mudrich, Mudrich has presented evidence that he was meeting Wal-Mart's legitimate expectations sufficient to establish this element of his *prima facie* case.

## 2. Circumstances that Give Rise to an Inference of Discrimination

Wal-Mart also objects that Mudrich has not demonstrated the fourth prong of his *prima facie* case, circumstances that give rise to an interference of discrimination. "[A] plaintiff can satisfy the fourth part of the prima facie case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class . . . ." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011). Wal-Mart contends that Mudrich must show that he was similarly situated to Kinnonen or some other female employee in all relevant respects. Although the Eighth Circuit has applied a "similarly situated in all respects" standard in some of its cases, another line of cases applies a lower threshold test "requiring only that the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Wimbley v. Cashion*, 588 F.3d 959, 962 (8th Cir. 2009) (internal quotation marks omitted) (discussing the two lines of cases and applying the latter standard).

Here, Mudrich and Kinnonen were accused of the same or similar conduct – providing services to customers without a charge. While Mudrich was disciplined, Kinnonen was not. Thus, applying the lower threshold standard, the Court finds that Mudrich has adequately established this element of his *prima facie* case.

### B. Wal-Mart's Non-Discriminatory Reason and Pretext

Wal-Mart proffers a legitimate non-discriminatory reason for Mudrich's termination: Mudrich failed to complete an action plan as part of his D-Day discipline. Because Wal-Mart presents a legitimate reason for the employment action, Mudrich can prove discrimination only by showing that Wal-Mart's explanation is pretextual. *McDonnell Douglas*, 411 U.S. at 804. "A plaintiff may show pretext, among other ways, by showing that an employer . . . treated similarly-situated employees in a disparate manner." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).

Wal-Mart again objects that Mudrich cannot show that Wal-Mart treated a similarly-situated employee in a disparate manner. "At the pretext stage of the *McDonnell Douglas* burden-shifting framework, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005), *abrogated on other grounds by Torgerson*, 643 F.3d 1031. Mudrich must show that he and Kinnonen are similarly situated in all relevant respects. *Wimbley*, 588 F.3d at 962. "Specifically, the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004) (quoting *EEOC v. Kohler Co.*, 335 F.3d 766, 776 (8th Cir. 2003)). At the same time, Mudrich must "be afforded a fair opportunity to show" that Wal-Mart's stated reason for the differential treatment "was in fact pretext." *McDonnell Douglas*, 411 U.S. at 804.

It is uncontested that Gilmore supervised both Mudrich and Kinnonen and that both were subject to the same disciplinary policies. Mudrich contends that Gilmore engaged in the same conduct – providing unauthorized discounts – but that Gilmore chose not to investigate or discipline Kinnonen. Therefore the Court finds the two employees sufficiently similarly situated to create a question of fact as to whether Wal-Mart's proffered non-discriminatory reason was pretextual.

Wal-Mart argues that Mudrich must produce evidence that Wal-Mart believed Mudrich and Kinnonen engaged in the same behavior and yet treated the two employees differently. That is, Mudrich must show that Gilmore believed both employees guilty of misconduct or both employees innocent of misconduct and yet treated the two employees differently. *See, e.g.*, *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 957 (8th Cir. 2012). The Court concludes that there is a factual dispute regarding what Gilmore believed. While Wal-Mart clearly contends that Gilmore believed Mudrich was guilty of providing unauthorized discounts, it is unclear from the testimony whether Gilmore believed Kinnonen also provided unauthorized discounts or even investigated Mudrich's claims that Kinnonen had used his handset to provide unauthorized discounts. *Cf. Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 701 (8th Cir. 2006) (finding employees were not similarly situated when the complaints against one employee were unsubstantiated). Construing the facts in the light most favorable to Mudrich, it is possible that Gilmore believed both employees had provided unauthorized discounts but only investigated and disciplined Mudrich. Mudrich has therefore created a factual dispute on the issue of pretext.

Wal-Mart also argues that Mudrich and Kinnonen were not similarly situated because there is no evidence they had similar discipline histories. *See Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 692 (8th Cir. 2002) (finding non-comparable employees with different disciplinary histories). But Mudrich disputes whether the previous instances identified by Wal-Mart were disciplinary proceedings sufficient to create a "disciplinary history." Moreover, if gender discrimination was, indeed, present in the workplace, preventing investigations from occurring, then different disciplinary histories would be expected. In sum, the Court finds that Mudrich has provided evidence that he and Kinnonen were similarly situated and differentially treated, creating a factual dispute regarding whether Wal-Mart's proffered non-discriminatory reason was pretextual.[4] Thus, the Court will deny Wal-Mart's motion for summary judgment on Mudrich's wrongful termination/gender discrimination.

### III. MUDRICH'S DEFAMATION CLAIM

Mudrich's defamation claim is based on Gilmore's accusation that he was giving away services and her questions regarding why his name was on the tickets. Mudrich contends that Gilmore implied that he was a thief. Under Minnesota law, to prove defamation Mudrich must prove "that a statement was false, that it was communicated to someone besides [him], and that it tended to harm [his] reputation and to lower him in the

---

[4] The R&R also addressed whether Mudrich could rely on any credible evidence tending to establish that Wal-Mart acted adversely to him on account of his gender. Because the Court finds that Mudrich has established a *prima facie* case and created a factual dispute regarding whether Wal-Mart's non-discriminatory reason was pretextual, it does not need to consider this alternative analysis.

estimation of the community." *Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 25 (Minn. 1996). The allegedly defamatory statement may fall into one of three categories: "(1) those that are clearly defamatory on their face; (2) those that could not possibly have a defamatory meaning; and (3) those that are reasonably susceptible to a defamatory meaning as well as an innocent one." *Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*, 85 F.3d 383, 386 (8th Cir. 1996).

Wal-Mart contends that the statements Mudrich identified are not susceptible to a defamatory meaning and that they cannot be defamatory because the statements were true.[5] The truth of Gilmore's statement is disputed and is a factual issue for a jury. The Court also concludes that the interpretation of the allegedly defamatory statements is a fact question for a jury. *See id.* ("If the words are capable of the defamatory meaning, it is for the jury to decide if they were in fact so understood." (quoting *Utecht v. Shopko Dep't Store*, 324 N.W.2d 652, 654 (Minn. 1982)). Wal-Mart's argument that "any question posed by an employer in an attempt to investigate the facts surrounding a policy violation would result in a potential defamation claim" rings hollow. (Def.'s Mem. in Opp. at 11.) Gilmore did not need to confront Mudrich in front of other employees who had no role in his disciplinary proceedings. Taken in context, Gilmore's statements could have been interpreted as accusing Mudrich of theft. Thus, the Court will deny Wal-Mart's motion for summary judgment on Mudrich's defamation claim.

---

[5] Wal-Mart also notes that there is no evidence of malice. While malice is relevant to a defamation inquiry in the context of qualified or conditional privilege, *see Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 256 (Minn. 1980), Wal-Mart does not contend in its briefing that qualified privilege is applicable.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, the Court **OVERRULES** the defendant's objections [Docket No. 115] and **ADOPTS** the Report and Recommendation of the Magistrate Judge dated March 22, 2013 [Docket No. 111]. Accordingly, **IT IS HEREBY ORDERED** that Wal-Mart Stores, Inc.'s Motion for Summary Judgment [Docket No. 90] is **GRANTED in part** and **DENIED in part** as follows:

1. The motion is **GRANTED** with respect to the plaintiff's whistleblower claim;

2. The motion is **DENIED** with respect to the plaintiff's wrongful termination/gender discrimination claims and his defamation claim.

DATED: July 8, 2013　　　　　　　　　　　　　____s/ John R. Tunheim____
at Minneapolis, Minnesota.　　　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　　United States District Judge